**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**ANGELINE CACCHILLO,**

**Plaintiff,**

**V.** **Civil Action No. 1:10-cv-01199 (TJM/RFT)**

**INSMED INC.,**

**Defendant.**

---

**THOMAS J. McAVOY,**
**Senior United States District Judge**

**DECISION & ORDER**

## I. INTRODUCTION

Plaintiff commenced this action asserting claims pursuant to 42 U.S.C. §1983 and New York State common law following her participation in a phase II clinical trial of Defendant's investigational drug IPLEX™ ("IPLEX"). She moves for a preliminary injunction requiring Defendant to: (1) "provide to [Plaintiff] a written statement directed to the United States Food and Drug Administration ("FDA") in a form customary for such submissions supporting the 'compassionate use' of . . . IPLEX for Angeline Cacchillo, stating that Insmed, Inc. will, without reservation, provide Angeline Cacchillo the medication IPLEX at cost upon the granting of her compassionate use application by the FDA"; and (2) "directing Insmed Inc., in the event that Angeline Cacchillo's application is

granted by the FDA, to provide Angeline Cacchillo IPLEX according to the amount allowed by the FDA's compassionate use grant and subject to Angeline Cacchillo's agreement to compensate Insmed, Inc. for the cost of the IPLEX thereby provided." Defendant opposes the preliminary injunction.

## II. BACKGROUND[1]

Plaintiff Angeline Cacchillo, a New York resident, was diagnosed with Type 1 Myotonic Muscular Dystrophy ("MMD1") in July 2005. Cacchillo Aff. ¶¶ 2, 5, 10. MMD1 is degenerative genetic neuromuscular disease which, in laymen's terms, attacks the muscles' ability to retract once contracted and, over time, attacks the muscles themselves including those necessary for the heart, brain, respiratory and digestive systems to function. Id. ¶ 6. There is no FDA accepted treatment for MMD1 "and only superficial treatments designed to minimize the discomfort of MMD1." Id. ¶¶ 9, 14.

Insmed is a research-based pharmaceutical company located in Richmond, Virginia. Insmed scientists developed the drug IPLEX (mecasermin rinfabate [rDNA origin] injection). IPLEX is a combination of two substances: human insulin-like growth factor 1 (IGF-1) and human insulin-like growth factor-binding protein-3 (rhIGFBP-3). See Declaration of Kevin P. Tully ("Tully Decl.") at ¶ 2.

On December 12, 2005, the FDA approved IPLEX for the treatment of growth failure in children with severe primary IGF-1 deficiency (Primary IGFD) or with growth hormone ("GH") gene deletion who have developed neutralizing antibodies to GH. See Tully Decl. at ¶ 3. One year before the FDA approval, Genentech, Inc. and Tercica, Inc.

---

[1] Unless stated otherwise, the facts recited in the text are not in dispute.

instituted a patent infringement suit against Insmed and others with respect to certain patents underlying IPLEX. See Genentech, Inc. v. Insmed, Inc., No C-04-5429 (N.D. Cal. filed Dec. 23, 2004). On December 6, 2006, a jury returned a verdict finding that Insmed had infringed the various patents at issue. On March 6, 2007, the court entered a consent judgment and permanent injunction prohibiting, subject to certain limited exceptions, Insmed from, among other things, manufacturing, distributing or using IPLEX. Insmed was permitted, under the terms of the Judgment, to develop and undertake clinical trials for certain limited conditions including MMD1 and Amyotrophic Lateral Sclerosis ("ALS" or "Lou Gehrig's disease")(Italy only). On March 6, 2007, Insmed ceased commercial distribution of IPLEX. See Tully Decl. at ¶ 4.

Starting in 2007, Insmed entered into site agreements with thirteen academic centers, including Ohio State University ("OSU"), under which the sites and their investigators agreed to conduct phase II, double-blind, two-arm,[2] clinical trials of IPLEX for patients with MMD1.[3] The phase II study was funded by Insmed and a private grant. Insmed paid each site on a per patient basis for conducting the phase II study. See Tully Decl. at ¶ 5. In all, sixty-nine (69) subjects were enrolled in the study at the thirteen sites, including nine subjects at OSU. Id. ¶ 9. Enrolled patients received a daily dose of either IPLEX or a placebo for twenty-four weeks and, during that period, were regularly

[2]A double-blind study is one in which neither the investigator (í.e., physician in charge of the study at a given site) nor the patient knows whether the patient is receiving the active drug or a placebo. A two-arm study is one in which a patient may receive one of two articles--the active drug in a uniform dosage or a placebo.

[3]For an overview of the FDA clinical trial process relative to investigative drugs, see Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach,495 F.3d 695, 697-99 (D.C. Cir. 2007) (*en banc*), cert. denied, --U.S. --, 128 S. Ct. 1069 (2008).

evaluated to determine progress and whether there were any untoward side-effects. Id. ¶ 6.

Plaintiff became aware of the IPLEX phase II clinical trial through one of her treating physicians, Dr. Lan Zhou. Cacchillo Aff. ¶ 15. In August 2007, Dr. Zhou spoke with Ronald D. Gunn, the Executive Vice President and Chief Financial Officer of Insmed, about Plaintiff's participation in the clinical trial. Id. ¶ 20. Although it was too late for Plaintiff to participate in phases I and IIA of the clinical trial, Mr. Gunn indicated that Plaintiff might be able to participate in the phase IIB trial. Id. ¶ 23. Mr. Gunn advised Plaintiff to contact Christine O'Neil, Insmed's Study Manager for Phase IIB of the MMD1 trial. Id. ¶ 24. Plaintiff spoke with Ms. O'Neil several times and, "[w]ith Study Manager O'Neil's help, in February 2008, [Plaintiff] applied for and was accepted to be a subject of the MMD1 trial. . ." conducted at Ohio State University. Id. ¶¶ 30, 36.

Plaintiff contends that Insmed's Internet web site, and OSU trial administrators, represented that Insmed would support FDA "compassionate use" applications by participants following the trial and that she would not have participated without such representations. Cacchillo Aff. ¶¶ 42-53. Insmed denies that it made any such representation either on its web site or through authorized representatives. Tully Suppl. Decl. ¶ 8.[4] [5]

As part of the clinical trial process, each academic center conducting the phase II studies was required to provide each subject, prior to accrual into the study, with an

---

[4]Insmed has provided printed copies of its web site pages which do not contain this representation.

[5]Insmed contends that OSU clinical trial administrators had no authority to bind Insmed.

informed consent form as approved by that center's institutional review board ("IRB") . See 27 C.F.R. pts. 50, 56. The informed consent form set out the purpose of the study, the nature of the study, exclusion and inclusion criteria, the risks associated with the study and the possible benefits of the study.[6]

The informed consent form used at OSU (and provided to Plaintiff) contains no promise to continue providing medication to any subject beyond the study. To the contrary, the consent form indicates that the study drug will be available only during the twenty-four week study and, in addition, that the sponsor (Insmed) could stop the study, or any individual's participation in the study, at any time. See Consent Form, Pl. Ex. B., p. 14.

Plaintiff received her first dose of IPLEX on May 7, 2008 and completed the study on October 21, 2008. As part of the clinical trial, Plaintiff made eight round trip trips from her home in Schenectady, New York to the OSU campus in Columbus, Ohio. Cacchillo Aff. ¶ 54. Plaintiff's expenses incurred in the making the trips were partially reimbursed. Id. ¶ 53. During each visit to OSU, Plaintiff was monitored and tested in accordance with the protocols of the study to determine whether she was progressing toward the "end-points" of the study. See Tully Decl. ¶ 7.[7] Plaintiff was also provided with a supply of the IPLEX which she was required to inject on a daily basis. See Consent Form, Pl. Ex. B;

---

[6]Defendant asserts that the informed consent form, as signed by the academic center and subject, represented the written contract between that center and the patient/subject, and that there was no comparable document linking any subject and Insmed. See Tully Decl. at ¶ 8.

[7]("In clinical trials aimed at assessing a new drug's efficacy, the sponsor and FDA agree on certain key end-points which can be objectively measured to determine whether the drug is in fact effective at treating the targeted condition. In the [MMD1] phase II study, one of the primary endpoints included a six-minute walk in which the distance subjects were able to cover in six minutes was measured.").

Cacchillo Aff. ¶ 54; Plaintiff attests that:

> While undergoing treatment with IPLEX, I experienced near total recovery of my day-to-day functionality; I was able to, for example, shop an entire day without resting whereas prior to my IPLEX treatment I was able to shop for only twenty-minutes or so before I was forced to rest and was unable to walk up any incline without substantial assistance. While realizing this dramatic recovery I experienced no side-effects.

Cacchillo Aff. ¶¶ 56-57.

After the close of the study, Insmed reviewed the results to determine whether Insmed should proceed to a phase III trial. Tully Decl. ¶ 11. These data were provided to the FDA on June 25, 2009, and a final clinical study report submitted to the FDA on March 25, 2010. Id. Insmed determined that the scientific data generated by the phase II study did not suggest that the drug was effective to treat MMD1 and, as a result, Insmed determined that it would not have been appropriate to proceed to a phase III trial. Id. On June 25, 2009, Insmed announced that it would not be proceeding to a phase III trial. Id.

Following the close of the study, Plaintiff, with the support of the OSU trial Sub-Investigator Victoria Lawson, M.D., approached Insmed and requested that it support her application to the FDA for a "compassionate use" exception to the Food, Drug, and Cosmetic Act ("FDCA" or "Act"). See 21 U.S.C. § 355(a).[8] Insmed asserts that while Plaintiff may believe that she improved dramatically during the trial, the data suggested otherwise. "In objective measures of functionality commonly used in clinical trials, she showed little or no meaningful improvement. Furthermore, many patients receiving the

[8] The FDCA generally prohibits access to new drugs unless and until they have been approved by the FDA. A "compassionate use" exception, explained in more detail in the text, is one exception to this rule.

placebo demonstrated comparable or, in some cases, greater improvement than Plaintiff." Tully Decl. ¶ 11. On August 6, 2009, Insmed responded to Plaintiff's request by stating that, "[u]nfortunately, we are unable to grant your request for compassionate use of IPLEX™ due to the fact that the clinical trial design of the study in which you participated does not allow for open label extension use (compassionate use). We also provided this information to the Department of Neurology at Ohio State last month after they brought your interest to our attention." Id. ¶ 13 (quoting Letter from Glen Kelley, Vice President, Regulatory Affairs, Insmed to Angeline J. Cacchillo (Aug. 6, 2009)).

After Plaintiff stopped taking IPLEX at the conclusion of the phase IIB trial, she "experienced a precipitous decline in [her] condition and [is] now in worse condition than [she] was prior to February 2008." Cacchillo Aff. ¶ 74. "The instability caused by allowing my body's physiology to develop a dependence on IPLEX and then rapidly withdrawing IPLEX from my body was physically and emotionally traumatic and caused me additional pain over and above what I would have experienced if my MMD1 had been allowed to progress without the destabilizing intervention of IPLEX." Id. ¶ 75.

In the instant action, Plaintiff brings claims pursuant to 42 U.S.C. § 1983 asserting that Defendant deprived her of constitutional due process and equal protection under the law by depriving her of continued access to IPLEX, see Compl, ¶¶ 191-94; and pursuant to New York State common law asserting that Defendant: fraudulently induced her to enter the phase IIB MMD1 trial with the false promise to support her compassionate use application, id. ¶¶ 195-197; negligently represented that it would support her compassionate use application, id. ¶¶ 198-200; breached the contract between Plaintiff

and Defendant, id. ¶¶ 201-03; intentionally inflicted emotional distress upon her by providing her with IPLEX but then refusing to support her compassionate use application, id. ¶¶ 204-06; violated an assumed duty of care to her by refusing to support her compassionate use application, id. ¶¶ 207-210; breached its fiduciary duty to Plaintiff by refusing to support her compassionate use application, id. ¶¶ 211-14; acted negligently by refusing to support her compassionate use application, id. ¶¶ 215-17; and was unjustly enriched at Plaintiff's expense, id. ¶¶ 218-220. Plaintiff seeks compensatory and punitive monetary damages, and such other and further relief as the Court deems appropriate. Id. As indicated above, Plaintiff moves for a preliminary injunction requiring Defendant to: (1) "provide to [Plaintiff] a written statement directed to the United States Food and Drug Administration ("FDA") in a form customary for such submissions supporting the 'compassionate use' of . . . IPLEX for Angeline Cacchillo, stating that Insmed, Inc. will, without reservation, provide Angeline Cacchillo the medication IPLEX at cost upon the granting of her compassionate use application by the FDA"; and (2) "directing Insmed Inc., in the event that Angeline Cacchillo's application is granted by the FDA, to provide Angeline Cacchillo IPLEX according to the amount allowed by the FDA's compassionate use grant and subject to Angeline Cacchillo's agreement to compensate Insmed, Inc. for the cost of the IPLEX thereby provided." Pl Mot. for Prel. Inj. [dkt. # 4].

One of the grounds for Insmed's opposition to the preliminary injunction is that it no longer manufactures IPLEX, see Tully Decl. ¶ 15,[9] and that the remaining stores of IPLEX

[9]("On March 31, 2009, Insmed sold the facility that it used to manufacturer IPLEX and therefore, the manufacture of the drug for any purpose ceased.").

have been allocated by the FDA and the Italian government to certain ALS patients in the United States and Italy. In this regard, Insmed's representative attests that between January 1, 2009 and March 10, 2009, the FDA received requests from physicians on behalf of their ALS patients in the United States to conduct what are termed "single patient INDs." Tully Decl. ¶ 14.[10] At that time, the FDA issued an announcement indicating that any ALS patient whose physician's single patient IND request was filed by March 6, 2009 would be permitted to proceed, id., "and Insmed has agreed to supply IPLEX to those patients." *FDA Position on Allowing Patients with ALS Access to IPLEX under an IND*, http://www.fda.gov/Drugs/ResourcesForYou/HealthProfessionals/ucm118121.htm (page last updated: 07/01/2009 )("FDA Position Statement")(viewed by the Court on October 19, 2010). In that announcement, the agency also stated that the "remaining supply of IPLEX, which is very limited, may be used by Insmed to conduct a clinical trial under an IND in which other patients with ALS who are interested in receiving IPLEX treatment will be randomly assigned to receive drug through a lottery system." Tully Decl. ¶ 14 (quoting FDA Position Statement). According to the FDA Position Statement:

> The FDA's decision [to allow ALS patients IND access to IPLEX] comes after serious consideration of the needs of patients with ALS and the practical limitations posed by the extremely limited supply of the drug. The agency has carefully reviewed all available studies and data on the potential benefits and risks to patients with ALS, as well as the need to have as fair a plan as possible for allocating the limited supply of the drug among the patients who want to receive it.

---

[10]A single patient IND is a regulatory vehicle that enables a physician to obtain an experimental drug for a single patient who either does not qualify for an actual clinical trial or the clinical trial has closed. Tully Decl. ¶ 14.

> FDA has received a number of single-patient IND requests from physicians to allow "compassionate use" of IPLEX for named patients with ALS. In reaching its decision on permitting investigational use of IPLEX in patients with ALS, FDA recognized that solely granting access to the drug under single-patient INDs would rapidly deplete the limited supply of IPLEX and make it virtually impossible to conduct a controlled clinical trial. This is critical, because without adequate controlled clinical trials, it is not possible to determine whether IPLEX is effective, or harmful, in patients with ALS.
>
> The FDA believes its decision represents the fairest way possible to provide access to IPLEX, first, because Insmed does not have enough drug for every patient who may request it and, second, because it is important to maximize what can be learned from the remaining supply of drug in case it does have benefit, and could be further developed for widespread use by patients with ALS.
>
> FDA has attempted to balance the needs of individual patients who are desperately seeking treatment options for this devastating disease with the need to learn if the drug is in fact beneficial, or harmful, in treating patients with ALS. These considerations were weighed over the last few weeks by FDA scientists and physicians, who held a series of meetings with Insmed and internal meetings to discuss the best path forward.

FDA Position Statement.

ALS patients in Italy also receive IPLEX from Insmed through the Italian Ministry of Health and in accordance with Italian law. Tully Decl. § 16; see also FDA Position Statement.[11] "Currently eight ALS patients are receiving the drug under single patient INDs in the United States and an additional twenty-six ALS patients are receiving the drug under Italian law." Tully Decl. ¶ 16. "Based on current projections, Insmed estimates that the existing stores of the drug will be exhausted sometime in the second quarter of 2011 (*i.e.*, April 1-June 30)." Id.

---

[11] (Indicating that, in determining to approve ALS patients' INDs for IPLEX, the FDA contacted its counterpart agency in Italy and reviewed "information about that program and to inquire about any data that may have been collected from that experience.").

## III. DISCUSSION

### a. Article III Standing

Insmed argues that Plaintiff lacks Article III standing to bring the preliminary injunction motion because her injury is not likely to be redressed by a favorable ruling on the motion. In this regard, Insmed contends that because the FDA, a non-party to the action, must ultimately determine whether Plaintiff is entitled to compassionate use of IPLEX, Plaintiff's sought-after relief is wholly speculative. Moreover, Defendant argues that because the remaining stores of IPLEX have already been allocated to a limited number of ALS patients in the United States and Italy, Insmed cannot support Plaintiff's compassionate use request to the FDA because it has no ability to provide Plaintiff with IPLEX. Therefore, Defendant argues, the sought-after relief cannot be redressed by a favorable determination in this Court. The Court agrees.

> We begin with the most basic doctrinal principles: Article III, § 2, of the Constitution restricts the federal "judicial Power" to the resolution of "Cases" and "Controversies." That case-or-controversy requirement is satisfied only where a plaintiff has standing. See, e.g., DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 126 S. Ct. 1854, 164 L. Ed.2d 589 (2006). And in order to have Article III standing, a plaintiff must adequately establish: (1) an injury in fact (i.e., a "concrete and particularized" invasion of a "legally protected interest"); (2) causation (i.e., a " 'fairly ... trace[able]' " connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is " 'likely' " and not "merely 'speculative' " that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit). Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561, 112 S .Ct. 2130, 119 L. Ed.2d 351 (1992) (calling these the "irreducible constitutional minimum" requirements).

Sprint Communications Co., L. P. v. Apcc Services, Inc., 554 U.S. 269, 128 S. Ct. 2531, 2535, 171 L. Ed.2d 424 (2008); see also Pac. Capital Bank, N.A. v. Connecticut, 542 F.3d

341, 350 (2d Cir. 2008).[12]

A party seeking injunctive relief must establish the irreducible constitutional minimum requirements of standing, see Summers v. Earth Island Institute, 129 S. Ct. 1142, 1149 (2009),[13] and that party "bear[s] the burden of alleging facts that demonstrate [her] standing." LaFleur v. Whitman, 300 F.3d 256, 268 (2d Cir. 2002); see also Baur v. Veneman, 352 F.3d 625, 642 n. 15 (2d Cir. 2003).[14] The redressability inquiry “focuses . . . on whether the injury that a plaintiff alleges is likely to be redressed through the litigation.” Sprint Communications, 128 S. Ct. at 2542. To demonstrate redressability, a plaintiff must show a “substantial likelihood that the requested relief will remedy the alleged injury in fact.” Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 771, 120 S. Ct. 1858, 146 L. Ed.2d 836 (2000)(internal quotation marks and citation omitted). Put another way, to satisfy redressability a plaintiff must demonstrate that it is “likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.” Lujan, 504 U.S. at 560 (citations and internal quotation marks omitted).

---

[12](To satisfy Article III's standing requirements, a party must demonstrate that "‘(1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.’ ")(quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81, 120 S. Ct. 693, 145 L. Ed.2d 610 (2000)).

[13](“To seek injunctive relief, a plaintiff must show that [s]he is under threat of suffering ‘injury in fact’ that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.”)(citing Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 180-181, 120 S. Ct. 693, 145 L. Ed.2d 610 (2000)).

[14]("[A] plaintiff must demonstrate standing for each claim and form of relief sought.").

Without FDA approval of a compassionate use of IPLEX, Plaintiff is unable to take the drug to treat her MMD1. See 21 U.S.C. § 355(a). To the extent that Plaintiff's "injury in fact" is that she is unable to take IPLEX, redress is dependent on the FDA's determination of her compassionate use application. In that the FDA is not a party to this action, it is wholly speculative that this injury will be redressed by a favorable decision on Plaintiff's preliminary injunction motion. See Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 40-46, 96 S. Ct. 1917, 48 L. Ed.2d 450 (1976);[15] Warth v. Seldin, 422 U.S. 490, 504-508, 95 S. Ct. 2197, 45 L. Ed.2d 343 (1975);[16] see also Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 125, 118 S. Ct. 1003, 140 L. Ed.2d 210 (1998)(Stevens, J., concurring).[17]

Assuming, arguendo, that Plaintiff's "injury in fact" is that Insmed will not support her compassionate use application thereby preventing her from appearing before the FDA on a compassionate use application, the question of redressability is rendered even more speculative when placed in the in the context of the facts of this case and the FDA's compassionate use regulations. "Compassionate use" is a colloquial term for an FDA

[15]("[T]he 'case or controversy' limitation of Art. III . . . requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.").

[16](stating that "the indirectness of the injury . . . may make it substantially more difficult to meet the minimum requirement of Art. III," and holding that the injury at issue was too indirect to be redressable).

[17]("[I]n every other case in which this Court has held that there is no standing because of a lack of redressability, the injury to the plaintiff by the defendant was indirect (e.g., dependent on the action of a third party).")(citing, *inter alia*, Simon; Warth; Leeke v. Timmerman, 454 U.S. 83, 86-87, 102 S. Ct. 69, 70 L. Ed.2d 65 (1981)(injury indirect because it turned on the action of a prosecutor, a party not before the Court); Linda R.S. v. Richard D., 410 U.S. 614, 617-619, 93 S .Ct. 1146, 35 L. Ed.2d 536 (1973)(stating that "[t]he party who invokes [judicial] power must be able to show ... that he has sustained or is immediately in danger of sustaining some direct injury" (emphasis in original) (internal quotation marks omitted); injury indirect because it turned on the action of the father, a party not before the Court.)).

mechanism that allows unapproved products, such as investigational drugs, to be available to patients before approval by the FDA of the product. For drug treatment uses, the FDA considers Individual New Drug Applications (INDs) including single-patient INDs under its "expanded access uses" criteria. See 21 C.F.R. §§ 312.305, 312.310; see also 21 U.S.C. § 360bbb(b).

The requested preliminary injunction seeks an order requiring Defendant to provide a statement to the FDA "supporting the 'compassionate use' of . . . IPLEX for Angeline Cacchillo." Insmed is of the opinion that, based upon the results of its MMD1 clinical trials, IPLEX is not justified for the treatment of MMD1 and, therefore, it could not truthfully sponsor a single-patient IND for Plaintiff that would satisfy the regulatory criteria. See 21 C.F.R. § 312.305(a)(2).[18] Despite the bargain that the parties might have reached in the past, neither law nor equity empowers the Court to compel a party to issue a false statement. See e.g. Abood v. Detroit Bd. of Educ., 431 U.S. 209, 234-35 (1977).[19] Thus, the refusal of Defendant to provide justification for the sought-after compassionate use application seemingly renders the application for it futile. This, in turn, renders redressability for Plaintiff's injury unlikely.

Plaintiff asserts in her most recent submission, however, that she intends to

---

[18]21 C.F.R. § 312.305(a)(2) provides: "(a) Criteria. FDA must determine that: . . . (2) The potential patient benefit justifies the potential risks of the treatment use and those potential risks are not unreasonable in the context of the disease or condition to be treated."

[19]("[A]t the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State.")

proceed before the FDA *via* a physician-submitted compassionate use application.[20] There is no dispute that, under the applicable criteria, for Plaintiff to be successful on a physician-submitted compassionate use application for the use of IPLEX, Insmed must: (1) agree to supply Plaintiff with the IPLEX if the application is granted, see Pl. *Memorandum on A Drug Manufacture's Role in the Compassionate Use Application Process* [dkt. # 19], pp. 4, 9; and (2) grant permission for the FDA to review the data from Insmed's IND application for IPLEX for the treatment of MMD1. See 221 C.F.R. 312.305(b)(1) and (3).

Defendant contends, however, that it cannot supply Plaintiff with IPLEX. The undisputed facts indicate that Defendant sold its IPLEX manufacturing facility and is no longer manufacturing the drug. Defendant's remaining supplies of IPLEX have been allocated to a limited number of ALS patients pursuant to FDA and Italian compassionate use programs and will be exhausted sometime in the second quarter of 2011. Accordingly, Insmed asserts that it cannot supply IPLEX to Plaintiff because it has no unaccounted for IPLEX.

To the extent that Plaintiff argues that the number of ALS patients receiving IPLEX has been diminishing since the stores of IPLEX were originally allocated to these patients, the argument is based upon mere surmise and is contrary to the evidence that Insmed's stores were rationed by the FDA to ALS patients by a lottery system. See Tully Decl. ¶

[20] Defendant raises the question as to whether a physician would submit, as opposed to merely support, the compassionate use application. This question raises an issue of ripeness, but the Court will proceed to address the standing challenge assuming, *arguendo,* that a physician would submit the application on Plaintiff's behalf.

14; FDA Position Statement. Further, the fact that the number of ALS patients who were originally allocated IPLEX may be diminishing does not refute Defendant's evidence that the stores of IPLEX will be exhausted in the second quarter of 2011. Tully Decl. ¶ 14.

Still further, and assuming that additional unaccounted for stores of IPLEX existed, the ultimate relief that Plaintiff seeks (allocation to her of IPLEX) is conditioned on the FDA's determination that Plaintiff would be allocated the drug and not an ALS patient (either one who had not been allocated the drug in the first instance or current user who might be allocated more IPLEX). The argument that the FDA may determine that IPLEX is not effective for ALS treatment and may be allocated to Plaintiff underscores the speculation upon which Plaintiff proceeds on the preliminary injunction motion.

The argument that Defendant could buy IPLEX from a company in England[21] and supply it to Plaintiff runs contrary to Plaintiff's argument that she may dispense with 21 C.F.R. § 312.305(b)(2)(iv) and (vi)'s requirements that the applicant's sponsor describe the facility where the drug will be manufactured and provide chemistry, manufacturing, and controls information.[22] Further, under FDA regulations, Insmed would not be required to supply IPLEX even if additional stores existed. See *Access to Investigational Drugs*

[21]The Verified Compliant asserts that "[i]n July of 2002, Insmed entered into an agreement with Avecia, Inc., a British company, to produce and distribute IPLEX in Europe." Compl. ¶ 67. Defendant asserts, through counsel, that "[n]o such facility exists."

[22]21 C.F.R. § 312.305(b)(2)(v) provides that the expanded access submission must include " (v) A description of the facility where the drug will be manufactured." Section 312.305(b)(2)(v) requires that the expanded access submission must include "(vi) Chemistry, manufacturing, and controls information adequate to ensure the proper identification, quality, purity, and strength of the investigational drug." Plaintiff argues that because ALS patients' expanded use applications were granted after Insmed sold the IPLEX manufacturing facility, the FDA must be aware of the information relative to the Insmed facility and, therefore, this information should not be required for Plaintiff's application either. However, if the drugs are obtained from a third-party, then the information would seemingly be required of the third-party's facility and production methods in accordance with the federal regulations.

*Outside of a Clinical Trial (Expanded Access)*, http://www.fda.gov/ForConsumers/ByAudience/ForPatientAdvocates/AccesstoInvestigationalDrugs/ucm176098.htm (Page last updated 06/30/2010) (viewed by the Court 10/21/10).[23] Thus, despite that the Court could conceivably order Defendant to supply the drug *if* the FDA approved Plaintiff's compassionate use application, Insmed's reluctance to justify the use of IPLEX to treat MMD1 makes Plaintiff's chance of success before the FDA all the more remote.

Based on the evidence before the Court, there is little doubt that Plaintiff saw a subjective improvement in the effects of her MMD1 during the twenty-four weeks that she was administered IPLEX. Because IPLEX is an investigational drug, Plaintiff cannot obtain it without the FDA granting her a compassionate use authorization. And, without the compassionate use authorization, Plaintiff suffers an injury in fact in that she will be deprived of a drug that has helped her condition.

As Plaintiff's counsel so ably argued to the Court, Plaintiff cannot "get up to bat" before the FDA without Defendant's support for her compassionate use application. However, this Court does not have the power or the authority to direct the FDA to do anything with regard to the sought-after compassionate use authorization. Moreover, the undisputed facts reveal that Defendant's phase II clinical trial data do not support the efficacy of IPLEX for the treatment of MMD1, Defendant no longer produces IPLEX, and the limited supply of the drug has been allocated by the FDA and the Italian government

[23] ("Companies are not required to make their drug available through expanded access, or to make more of a drug for that purpose.").

to ALS patients. It is mere speculation that, even if the Court were to order Insmed to agree to supply Plaintiff with IPLEX *if* the compassionate use application is granted, the relief in this Court would redress her injury. In light of this inherent speculation, the Court concludes that Plaintiff lacks standing to proceed for the sought-after preliminary injunction. Further, the lack of available IPLEX to allocate to Plaintiff, if that were the FDA's determination, puts the Court in the position of rendering a decision on an abstract issue or moot question. The Court does not have the authority to do so. See Church of Scientology v. United States, 506 U.S. 9, 12, 113 S. Ct. 447, 121 L .Ed.2d 313 (1992).[24]

## IV. CONCLUSION

For the reasons discussed above, the application for the preliminary injunction [dkt. # 4] is **denied**. Because this determination is dispositive of the only motion now before the Court, the Court does not reach the issue of whether there is personal jurisdiction over Defendant to maintain the action in this court. Defendant may renew this issue by presenting a motion pursuant to Fed. R. Civ. P. 12(b)(2).

**IT IS SO ORDERED.**

Dated: Oct . 22, 2010

Thomas J. McAvoy
Senior, U.S. District Judge

[24](It is well settled that federal courts do not have the authority "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.")(internal quotation marks omitted).